# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**CASE NO. 21-cr-00198-PAB**

**UNITED STATES OF AMERICA,**

             **Plaintiff,**

**v.**

**1.     KBM GROUP, LLC,**

             **Defendant.**

_____

**DEFERRED PROSECUTION AGREEMENT**

Defendant KBM Group, LLC ("KBM" or "the Company"), by its undersigned representatives, pursuant to authority granted to its Chief Financial Officer, reflected in Attachment A, and the United States Department of Justice Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") enter into this deferred prosecution agreement ("the Agreement"), the terms and conditions of which are as follows:

**Criminal Information and Acceptance of Responsibility**

1.     KBM acknowledges and agrees that the Government will file a one-count criminal Information in the United States District Court for the District of Colorado charging KBM with one count of Conspiracy to Commit Mail and Wire Fraud in violation of Title 18, United States Code, Section 1349 (the "Information"), arising out of the

1

conduct described in the Statement of Facts, attached hereto as Attachment B and incorporated by reference into this Agreement ("Covered Conduct"). In so doing, KBM: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the Covered Conduct and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Colorado. The Government agrees to defer prosecution of KBM pursuant to the terms and conditions described below.

2.      KBM admits, accepts, and acknowledges that it is responsible under United States federal law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. Should the Government pursue the prosecution that is deferred by this Agreement, KBM stipulates to the admissibility of the Statement of Facts in any proceeding by the Government, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding. KBM agrees that, effective as of the date KBM signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts

2

shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, KBM agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed (the "Effective Date") and ending thirty months after that date (the "Term"). KBM agrees, however, that, in the event the Government determines, in its sole discretion, that KBM has knowingly violated any provision of this Agreement, or has failed to completely perform or fulfill each of KBM's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion for up to a total additional time period of six months, without prejudice to the Government's right to proceed as provided in Paragraphs 26-29 below. Any extension of the Term extends all terms of this Agreement, including the terms of Attachment C (Compliance Measures) and Attachment D (Corporate Compliance Reporting), for an equivalent period. Conversely, in the event the Government finds, in its sole discretion,

that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), the Term shall be deemed to have not begun and all the provisions of the Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement was signed until the date the Court refuses to grant the exclusion of time plus six months.

## Relevant Considerations

4.    The Government enters into this Agreement based on the individual facts and circumstances presented by this case and KBM, including:

a.    KBM did not receive voluntary disclosure credit because it did not voluntarily and timely self-disclose to the Government the conduct described in the Statement of Facts;

b.    KBM received credit for its cooperation with the investigation conducted by the Government, including factual presentations to the Government and collecting, analyzing, and organizing voluminous evidence and information for the Government;

c.    KBM provided the Government all relevant facts known to it, including information about the individuals involved in the Covered

Conduct, and assisted the Government in understanding the complexities of its industry and data practices;

d.    KBM engaged in significant remedial measures, including that:

   i.   KBM separated employees known to KBM to have been involved in the Covered Conduct;

   ii.   KBM terminated business relationships with marketers and brokers known to have been involved in the Covered Conduct or that sent out false or deceptive mail solicitations to consumers, including solicitations seeking payment associated with falsely or unlawfully promised sweepstakes, lotteries, prizes, games of chance, personalized psychic services, automobile warranties, cures and treatments, and grant opportunities;

   iii.   KBM removed terminated clients' data from its cooperative database and engaged a third-party consultant to verify its data remediation protocol;

   iv.   KBM revised employee commission plans and co-op member agreements to align them with compliance program objectives;

   v.   KBM made substantial investments in staffing and resources for its legal and compliance teams; updated policies, procedures, and supervisory structures with an emphasis on detecting, and preventing, the sale of consumer data to current clients and

prospective clients proposing to engage in potentially fraudulent and deceptive marketing campaigns; and expanded employee training;

e.  KBM substantially enhanced, and has committed to continuing to enhance, its compliance program and internal controls, including through its engagement of an outside compliance expert, to ensure that KBM satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program), thereby safeguarding the integrity and proper use of consumer data;

f.  based on KBM's remediation and the state of its compliance program, the fact that the Covered Conduct concluded in 2018, and KBM's agreement to report to the Government as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Government determined that an independent compliance monitor was unnecessary;

g.  the nature and seriousness of the Covered Conduct;

h.  the pervasiveness of the misconduct within KBM;

i.  KBM has no prior criminal history; and

j.  KBM has agreed to continue to cooperate with the Government's ongoing investigation of individuals and other entities, including as described in Paragraph 5 below.

6

## Future Cooperation and Disclosure Requirements

5.      KBM shall cooperate fully with the Government in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts, and other conduct under investigation by the Government, subject to applicable laws and regulations, until the later of the date upon which all investigations and potential prosecutions arising out of such conduct are concluded or the end of the Term of this Agreement.  At the request of the Government, KBM shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of KBM, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts.  KBM's cooperation pursuant to this paragraph is subject to applicable law and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, KBM must provide to the Government a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and KBM bears the burden of establishing the validity of any such assertion.  KBM agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

        a.      KBM shall truthfully disclose all factual information with respect to its activities, those of its parent company and affiliates, and those of

7

its former, present and future directors, officers, employees, agents, business partners, brokers, and clients, including any evidence or allegations and internal or external investigations, about which KBM has any knowledge or about which the Government may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of KBM to provide to the Government, upon request, any document, record or other tangible evidence about which the Government may inquire of KBM;

b.   Upon request of the Government, KBM shall designate knowledgeable employees, agents or attorneys to provide to the Government the information and materials described in Paragraph 5(a) above on behalf of KBM. It is further understood that KBM must at all times provide complete, truthful, and accurate information;

c.   KBM shall use its best efforts to make available for interviews or testimony, as requested by the Government, former, present and future officers, directors, employees, agents and consultants of KBM. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with law enforcement and regulatory authorities. Cooperation under this paragraph shall include identification of

8

witnesses who, to the knowledge of KBM, may have material information sought by the Government;

    d.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Government pursuant to this Agreement, KBM consents to any and all disclosures, subject to applicable law and regulations, to other domestic and foreign law enforcement and regulatory authorities of such materials as the Government, in its sole discretion, shall deem appropriate; and

    e.    KBM will promptly report to the Government identified violations of federal law, or investigations of such violations, involving KBM or any of its directors, officers, employees, agents, or customers.

6.    On the date that the period of deferred prosecution specified in this Agreement expires, KBM, by its Chief Financial Officer (or such other similar officer not unacceptable to the Government), will certify to the Government that it has met its disclosure obligations pursuant to Paragraph 5 of this Agreement. The certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Total Criminal Monetary Amount

7.      The Government and KBM agree that the Total Criminal Monetary Amount to be paid by KBM pursuant to this Agreement is $42,000,000, which is comprised of the following components set forth below: (1) a Criminal Monetary Penalty of $8,500,000; and (2) a Victim Compensation Amount of $33,500,000.

8.      As a result of the Covered Conduct described in the attached Statement of Facts, the parties agree that the Government could institute a civil and/or criminal forfeiture action against certain funds held by KBM and that such funds would be forfeitable under the civil and criminal federal asset forfeiture laws.  Notwithstanding this agreement, the Government is not requiring KBM to pay a criminal forfeiture amount under this Agreement.  The Government agrees that this disposition is appropriate because of KBM's agreement to pay the Victim Compensation Amount, as well as the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The parties agree that the Government may pursue civil and criminal forfeiture in the event of a breach of this Agreement and subsequent prosecution.

9.      KBM acknowledges that no United States tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount. KBM shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Monetary Amount or any other agreement entered into with any other enforcement authority or a regulator

concerning the facts set forth in the Statement of Facts.

## **Payment of Criminal Monetary Penalty**

10.     The Government and KBM agree that application of the Sentencing

Guidelines to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level
is 27, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(J) | Loss of more than $3,500,000 | +18 |
| (b)(2)(A) | Victim enhancement | +2 |
| **Total** | | **27** |

c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is
$8,500,000 (the fine indicated in the Offense Level Fine Table)

d.      <u>Culpability Score.</u>  Based upon USSG § 8C2.5, the culpability score
is 5, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(5) | Substantial Authority Personnel Involved | +1 |
| (g)(3) | Acceptance of Responsibility | -1 |
| **Total** | | **5** |

e.      <u>Calculation of Fine Range</u>

| Base Fine | $8,500,000 |
|---|---|
| Multipliers | 1.0 (min)/ 2.0 (max) |
| Fine Range | $8,500,000/ $17,000,000 |

11.     KBM agrees to pay the Criminal Monetary Penalty of $8,500,000 to the United States Treasury not more than 10 days after the Agreement is fully executed pursuant to payment instructions provided by the Government in its sole discretion. KBM and the Government agree that the Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement, as well as the amount KBM agrees to pay in victim compensation, as described in Paragraphs 13-17 of this Agreement.

12.     The Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that $8,500,000 is the maximum fine that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Government agrees that under those circumstances, it will recommend to the Court that any amount paid as part of the Criminal Monetary Penalty should be offset against any fine the Court imposes as part of a putative future judgment.

### Payment of Victim Compensation Amount

13.     KBM agrees to pay the amount of $33,500,000 to compensate victims for losses from fraudulent mass-mailing schemes operated by individuals who acquired consumer data from KBM, as described in the attached Statement of Facts ("the Victim Compensation Amount").  KBM shall escrow and/or pay the Victim Compensation Amount to the United States or other entity after the Agreement is fully executed

12

pursuant to instructions provided by the Government in its sole discretion.

14.     KBM agrees to bear the cost of the administration of all victim claims by a third-party claim administrator ("Claim Administrator") who will report directly to the Government.  KBM may select the Claim Administrator subject to the approval of the Government, and KBM must submit its selection no later than forty-five days after the signing of this Agreement.  KBM further agrees to provide the Claim Administrator with full access to the books and records of KBM and all subsidiaries and affiliates as necessary for the Claim Administrator to compensate victims.

15.     KBM agrees that it will not employ or be affiliated with the Administrator for a period of not less than two years from the date on which the Administrator's term expires. Nor will KBM discuss with the Administrator the possibility of further employment or affiliation during the Administrator's term. Upon agreement by the parties, this prohibition will not apply to other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

16.     KBM agrees that it will not use the fact that any beneficiary seeks or receives any compensation from the Victim Compensation Amount to seek to preclude such beneficiary from pursuing any other lawful claim that such beneficiary might have against KBM.

17.     KBM agrees that any unclaimed part of the Victim Compensation Amount remaining at the end of the Term shall revert to the United States in the form of a

13

payment to the United States Postal Inspection Service Consumer Fraud Fund.

## Conditional Release from Liability

18.      Subject to Paragraphs 26-29 below, the Government agrees, except as provided in this Agreement, that it will not bring any criminal case against KBM relating to any of the Covered Conduct.  The Government, however, may use any information related to the Covered Conduct against KBM:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

19.      This Agreement does not provide any protection against prosecution for any future conduct by KBM.

20.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with KBM.

## Corporate Compliance Program

21.      KBM represents that it has implemented and will continue to implement a compliance and ethics program designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent and deceptive marketing campaigns, and related violations of federal law, throughout its operations, including those of its affiliates, agents, and joint ventures (to the extent that the Company manages or controls such joint ventures), and those of its contractors and

14

subcontractors, including, but not limited to, the minimum elements set forth in Attachment C of this Agreement.

22.     To address any deficiencies in its internal controls, policies, and procedures, KBM represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding the responsible acquisition, possession, transfer, use, and sale of consumer data. Where necessary and appropriate, KBM agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures to ensure that it maintains an effective compliance program, including a system of internal controls designed to effectively detect and deter violations of federal law associated with the acquisition, possession, transfer, use, and sale of consumer data. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C of this Agreement.

## Corporate Compliance Reporting

23.     KBM agrees that it will report to the Government annually during the Term of this Agreement regarding remediation and implementation of the compliance measures described in Attachment C of this Agreement. These reports will be prepared in accordance with Attachment D of this Agreement.

**Deferred Prosecution**

24.     In consideration of the undertakings agreed to by KBM in this Agreement, the Government agrees that any prosecution of KBM for the Covered Conduct described in the attached Statement of Facts is hereby deferred for the Term of this Agreement. To the extent there is conduct disclosed by KBM that is not set forth in the attached Statement of Facts or Information, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

25.     The Government further agrees that if KBM fully complies with all of its obligations under this Agreement, the Government will not continue the criminal prosecution against KBM described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within thirty days of this Agreement's expiration, the Government shall seek dismissal with prejudice of the criminal Information filed against KBM described in Paragraph 1, and agrees not to file charges in the future against KBM based on the Covered Conduct described in the attached Statement of Facts. If, however, the Government determines during this thirty-day period that the Company breached the Agreement during the Term, as described in Paragraphs 26-29, the Government's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 26-29, remains in full effect.

**Breach of the Agreement**

26.     If, during the Term of this Agreement, KBM (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately

16

false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 5 of this Agreement; (d) fails entirely to implement a compliance measure as set forth in Paragraphs 21-22 of this Agreement and Attachment C (as distinct from a failure to effectively perform a compliance measure subject to Stipulated Damages as set forth in Paragraph 30 of this Agreement); or (e) otherwise fails to perform or fulfill its obligations under this Agreement, KBM shall thereafter be subject to prosecution for any federal criminal violation of which the Government has knowledge, including, but not limited to, the charge in the Information described in Paragraph 1, which may be pursued by the Government in the United States District Court for the District of Colorado or any other appropriate venue.  Determination of whether KBM has breached the Agreement and whether to pursue prosecution of KBM shall be in the Government's sole discretion.  Any such prosecution may be premised on information provided by KBM, its subsidiaries and affiliates, or their personnel.  Any such prosecution relating to the Covered Conduct or relating to conduct associated with the Covered Conduct and known to the Government before the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against KBM, or its subsidiaries and affiliates, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, KBM agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be

17

tolled for the Term plus one year. In addition, KBM agrees that the statute of limitations as to any violation of U.S. federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Government is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

27.     In the event the Government determines that KBM has breached this Agreement, the Government agrees to provide KBM with written notice of such breach before instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, KBM shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions KBM has taken to address and remediate the situation, which explanation the Government shall consider in determining whether to pursue prosecution of the Company.

28.     In the event the Government determines that KBM has breached this agreement:  (a) all statements made by or on behalf of KBM to the Government or to the Court, including the attached Statement of Facts, and any testimony given by KBM before a grand jury, a court, or any tribunal, or at any legislative hearings, whether before or after this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against KBM, provided such statements or testimony are otherwise

admissible under the Federal Rules of Evidence, except for the attached Statement of Facts, which is admissible in whole; and (b) KBM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of KBM before or after this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any present or future director, officer or employee, or any person acting on behalf of, or at the direction of, KBM, will be imputed to KBM for the purpose of determining whether KBM has violated any provision of this Agreement shall be in the sole discretion of the Government.

29.    KBM acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if KBM breaches this Agreement and this matter proceeds to judgment.  KBM further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Stipulated Damages

30.    KBM and the Government agree that the Government, in its sole discretion, may impose damages ("Stipulated Damages") for any failure by KBM to effectively perform an obligation set forth in Paragraphs 21 or 22 of this Agreement or

19

Attachment C (collectively, the "Compliance Measures").  Stipulated Damages shall be calculated as ten thousand dollars ($10,000) total per day if Compliance Measures are not effectively performed, and will be assessed as follows:

a.      Upon the Government's determination that KBM has failed to effectively perform a Compliance Measure, the Government shall notify KBM in writing of its failure and the Government's exercise of its contractual right to demand payment of the Stipulated Damages (the "Demand Letter"). The Demand Letter shall set forth:

   i.      The Compliance Measure(s) that KBM has failed, in the Government's determination, to effectively perform;

   ii.      The date on which KBM first failed, in the Government's determination, to effectively perform the Compliance Measure(s);

   iii.      A description of Compliance Measure(s) not met sufficient to permit KBM to cure (as described below); and

   iv.      the amount of Stipulated Damages claimed by the Government as of the date of the Demand Letter.

b.      Within thirty (30) days after receipt of the Demand Letter, or such other period as the Government may agree in writing, KBM shall cure its failure to effectively perform the Compliance Measure(s) identified by the Government in the Demand Letter ("Cure Period").  If the failure is of a type that can be cured and KBM cures the failure within the Cure Period,

no Stipulated Damages shall be due.  If KBM does not cure the failure during the Cure Period, but KBM then subsequently cures the failure, Stipulated Damages calculated from the date on which KBM first failed to effectively perform the Compliance Measure(s) to the date of cure shall be immediately payable to the Government.  If the failure is one that cannot be cured, then Stipulated Damages calculated from the date on which KBM first failed to effectively perform the Compliance Measure(s) until the date that KBM remediates the failure to the Government's satisfaction shall be immediately payable to the Government.

c.      Determination of whether KBM has failed to effectively perform a Compliance Measure shall be in the Government's sole discretion. Determinations of whether a failure to effectively perform a Compliance Measure can be cured or has been cured, and determinations of when a failure has been cured or remediated shall all be in the Government's sole discretion.

d.      The Stipulated Damages shall be paid to the United States by electronic fund transfer according to wire transfer instructions that will be provided by the Government.

e.      KBM agrees that the United States District Court for the District of Colorado shall have jurisdiction over any action to collect Stipulated Damages.

f.     If KBM fails timely to make a required payment of Stipulated Damages, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment.

### Sale, Merger, or Other Change in Corporate Form of KBM

31.     Except as may otherwise be agreed by the parties in connection with a particular transaction, KBM agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to KBM's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force to that entity. KBM agrees that the failure to include these provisions in the transaction will make any such transaction null and void. KBM shall provide notice to the Government at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Government shall notify KBM prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at

any time during the Term, KBM engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Paragraphs 26-29 of this Agreement.  Nothing in this Agreement shall restrict KBM from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government.

### Public Statements by KBM

32.     KBM expressly agrees that it shall not, through present or future attorneys, officers, directors, agents, management level employees or any other person authorized to speak for KBM, make any public statement, in litigation or otherwise, contradicting in whole or in part the acceptance of responsibility by KBM set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of KBM described in this paragraph below, constitute a material breach of this Agreement, and KBM thereafter shall be subject to prosecution as set forth in this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to KBM for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Government.  If the Government determines that a public statement by

any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall so notify KBM, and KBM may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  KBM shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  No statement made by any former, present or future officer, director, employee, or agent of KBM in the course of any criminal, regulatory, or civil case initiated against such individual shall be imputed to KBM, unless such individual is speaking on behalf of KBM.

33.     KBM agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, KBM shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and KBM; and (b) whether the Government has any objection to the release.

34.     The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of KBM's cooperation and remediation.  By agreeing to provide this information to such authorities, the Government is not agreeing to advocate on behalf of KBM, but rather is

24

agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

35.     This Agreement is binding on KBM and the Government (again defined as the U.S. Department of Justice's Consumer Protection Branch and the U.S. Attorney's Office for the District of Colorado, collectively) but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Government will bring the cooperation of KBM and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by KBM.

## Notice

36.     Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

> Director, Consumer Protection Branch
> Civil Division
> U.S. Department of Justice
> 450 5th Street NW, Room 6400 South
> Washington, DC 20001

> Chief, Criminal Division
> U.S. Attorney's Office
> District of Colorado
> 1801 California Street, Ste 1600
> Denver, CO 80202

37.     Any notice to KBM under this Agreement shall be given by personal

delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

> KBM Group LLC
> C/O Chris Davies
> Wilmer Cutler Pickering Hale and Dorr LLP
> 1875 Pennsylvania Ave NW
> Washington, DC 20006

38.     Notice shall be effective upon actual receipt by the Government or KBM.

## **Complete Agreement**

39.     This Agreement sets forth all the terms of the agreement between KBM and the Government. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for KBM, and a duly authorized representative of KBM.


**AGREED:**

FOR KBM GROUP LLC:


Date: 6/11/2021 _____     By: *James G. Pike* _____
                                                 James G. Pike
                                                 Chief Financial Officer
                                                 KBM Group LLC


Date: 6/11/2021 _____     By: *Christopher Davies* _____
                                                   Christopher Davies, Esq.
                                                 Wilmer Cutler Pickering Hale and Dorr LLP
                                                 Counsel for KBM Group, LLC

FOR THE U.S. DEPARTMENT OF JUSTICE, CONSUMER PROTECTION BRANCH:

Date: 6/11/2021          By: *J. Matt Williams for*

Gustav Eyler
*Director*

Richard Goldberg
*Deputy Director*

John W. Burke
*Assistant Director*

J. Matt Williams
*Trial Attorney*

FOR THE U.S. ATTORNEY'S OFFICE, DISTRICT OF COLORADO:

Date: 6/11/2021          By: *Matthew J. Kirsch*

Matthew T. Kirsch
*Acting United States Attorney*

Rebecca Weber
Hetal Doshi
*Assistant U.S. Attorneys*

27

DocuSign Envelope ID: 9414D3B9-68A3-4326-BD57-1B37EAE1E698

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for KBM Group, LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the members of the Company. I have advised and caused outside counsel for the Company to advise the members fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Financial Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: ___6/11/2021___

KBM GROUP, LLC

By: ___*James G. Pike*___

James G. Pike

DocuSign Envelope ID: 9414D3B9-68A3-4326-BD57-1B37EAE1E698

## CERTIFICATE OF COUNSEL

I am counsel for KBM Group, LLC (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company members.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the members and the General Counsel of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the members, is an informed and voluntary one.

Date: _____      6/11/2021      By:_____  *Christopher Davies*

                                             Christopher Davies, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
Counsel for KBM Group, LLC

ATTACHMENT A

## CHIEF FINANCIAL OFFICER'S CERTIFICATE

I, James G. Pike, do hereby certify that I am the duly appointed and acting Chief Financial Officer of KBM Group, LLC, a limited liability company organized under the laws of Delaware ("KBM");

WHEREAS, KBM has been engaged in discussions with the United States Department of Justice, Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") regarding issues arising in connection with the use and sale of consumer data by employees of KBM; and

WHEREAS, in order to resolve such discussions, it is proposed that KBM enter into a certain agreement with the Government; and

WHEREAS, Sarah LaVoi, General Counsel, together with outside counsel for KBM, have advised KBM of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Government;

NOW, THEREFORE, BE IT RESOLVED, that:

1.      KBM (a) acknowledges the filing of the one-count Information charging KBM with Conspiracy to Commit Mail and Wire Fraud in violation of Title 18, United States Code, Section 1349 (the "Information"); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Government ("the

DocuSign Envelope ID: 9414D3B9-68A3-4326-BD57-1B37EAE1E698

Agreement"); and (c) agrees to pay a Total Criminal Monetary Amount of $42,000,000 under the Agreement with respect to the conduct described in the Information;

2.      KBM accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue; (c) consents to the filing of the Information, as provided under the terms of the Agreement in the United States District Court for the District of Colorado; and (d) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Government prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.      I am authorized, empowered and directed, on behalf of KBM, to execute the Agreement substantially in such form with such changes as I may approve; and

DocuSign Envelope ID: 9414D3B9-68A3-4326-BD57-1B37EAE1E698

4.      I am authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement of other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions.

Date: ___6/11/2021_____        By: _____*James G. Pike*_____

James G. Pike
Chief Financial Officer
KBM Group, LLC

ATTACHMENT B

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") and KBM Group, LLC ("KBM"). KBM hereby agrees and stipulates that the following information is true and accurate. KBM admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Government pursue the prosecution that is deferred by the Agreement, KBM agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

Relevant Entities and Business Units

1.      From approximately January, 2012 through December 2018 ("the Relevant Time Period"), KBM Group LLC ("KBM") was a Delaware limited liability corporation.

2.      KBM advertised itself as a "global leader in knowledge-based marketing solutions" that helped "businesses worldwide use their data to improve marketing performance, increase profits and ROI." KBM collected consumer data and employed sophisticated data modeling to assist its clients with identifying new potential customers and obtaining new information about the clients' existing customers. In particular, KBM's "iBehavior" cooperative database used computer models that analyzed a client's

transactional data (*i.e.,* the records of clients' interactions with consumers) along with the data of other clients to identify targeted lists of consumers likely to respond to the client's marketing campaigns and solicitations.   The iBehavior cooperative database contained data on more than 100 million households in the United States and served a client base of at least 2,500 clients at any given time.

3.      During the Relevant Time Period, KBM was organized into several lines of business.   The Merchant Services unit ("Merchant Services") licensed consumer data from the iBehavior cooperative database to existing clients and also recruited new clients to join the database.   Within Merchant Services there were several groups, including the Business Development group, which solicited new clients for Merchant Services, and the Solo-Continuity ("SOCO") group, which focused on data licensing to clients that mailed consumers solicitations offering a single product or to clients engaged in continuity sales programs (like a monthly recurring subscription program).

<u>KBM's Sale of Consumer Data to Deceptive Clients</u>

4.      During the Relevant Time Period, clients of Merchant Services included a number of entities and individuals that sent mailings to consumers with deceptive solicitations ("Deceptive Clients"), including sweepstakes, astrology, auto-warranty, dietary-supplement, and government-grant offers.  Consumers who responded to these deceptive solicitations frequently fell within the same demographic pool: elderly and vulnerable Americans.

5.      During the Relevant Time Period, KBM employees working within the scope of their employment in Merchant Services arranged for KBM to license consumer

data to more than a dozen Deceptive Clients they knew were engaged in fraud.  The

consumer data licensed to the Deceptive Clients came both from other Deceptive

Clients and legitimate business, non-profit, and charitable-organization clients, including

clients with many elderly customers.

6.      Due to their interactions with the Deceptive Clients and/or their

representatives, KBM employees were familiar with at least certain clients' practices, as

well as certain deceptive solicitations.  For example, when KBM recruited a Deceptive

Client (Client 1), an employee circulated samples of Client 1's fraudulent solicitations to

many other Merchant Services employees, including the General Manager.  The sample

solicitations, which Client 1 proposed to mail to thousands of consumers identified by

KBM, included statements like "Our company has been tasked with closing out your

account by paying out a certified check in your name. . .you are indeed the lucky

recipient and the exact amount of the payment I am require (sic) to send you is really:

45,000.00 dollars by bank check in your name."   The General Manager of Merchant

Services responded to the email that included the sample solicitations, stating, "Who

responds to this stuff?? Obviously we have those people."

7.      KBM employees worked to develop and increase business with the

Deceptive Clients despite receiving notice that some of the Deceptive Clients and the

perpetrators of similar schemes had been arrested, charged with crimes, convicted, and

otherwise were subject to law enforcement actions for defrauding U.S. consumers.  For

example, a KBM employee emailed a group of colleagues about a major Department of

Justice action focused on combatting mail fraud that targeted the elderly, exclaiming "We know some of these guys!" and specifically named Client 1 as being involved.

8.      KBM employees engaged in this conduct, in part, to benefit KBM, to acquire valuable data from Deceptive Clients for KBM, and to enrich themselves through sales-based compensation.  Merchant Services' development of business relationships with Deceptive Clients and acquisition of their data enhanced KBM's ability to model consumer data and thereby enable both Deceptive Clients and legitimate clients to solicit new consumers.

9.      Many of the Deceptive Clients operated "astrology" schemes.  The mail solicitations sent by these schemes promised that a "psychic" had an individualized vision about each mail recipient and offered purportedly personalized astrological services or unique, supernatural objects in exchange for a fee.  In reality, the mailings were mass-produced, and victims submitting money in response to the mailings received nothing of material value in return.

10.     Client 2 was an "astrology" Deceptive Client of Merchant Services.

a.      Client 2 provided Merchant Services employees with sample solicitations to show what it intended to mail to thousands of consumers identified by KBM.  These solicitations included statements like "My dear <FirstName>, I am going to send you, free of charge, the most POWERFUL GOOD LUCK TALISMAN you're ever going to experience!. . . I learned that a non-profit organization was offering certain people the chance to receive and wear this Magnetor Magnetic Bracelet for 30 days. . . This is why you, <FirstName> have

been selected – and why I am writing to you today so that you can participate in this independent study, for FREE. . . Also, <FirstName>, to prove your real desire to participate in this special and very serious research project (and to eliminate curiosity seekers), I am asking only for a small contribution towards the costs of research and publication: a symbolic contribution of only $20."

     b.     Despite the fraudulent nature of Client 2's solicitations, KBM licensed lists containing the names and addresses of over 350,000 U.S. consumers to Client 2 over several years.  Indeed, KBM stopped working with Client 2 only after a federal court enjoined Client 2 and numerous individuals from continuing to engage in mail fraud in November 2014.  A KBM employee notified a KBM Vice President of the injunction, sending the Vice President a press article entitled "Did these mail-order 'psychics' see the Justice Department coming?" which included allegations that Client 2 had "defrauded tens of millions of dollars from thousands of vulnerable citizens."

     c.     A few months later, KBM employees signed up another Deceptive Client despite the broker's acknowledgment that the new client was "another astrology type mailer similar to [Client 2] (who is no longer mailing)[.]"

11.     Merchant Services also provided potential victim information to a number of mass-mailing fraud schemes that sent "sweepstakes" solicitations to thousands of consumers, stating that the consumers had won a large prize.  The solicitations claimed that, to collect the promised prize, a recipient consumer needed to remit a small

processing fee. In reality, victims who paid the fee received nothing of value and were subjected to a barrage of additional solicitations making similar false promises.

12.    For example, Client 3 was a "sweepstakes" Deceptive Client of Merchant Services.

a.    Client 3 provided KBM with sample solicitations to show what it intended to mail to thousands of consumers identified by KBM. These solicitations included statements like "CONGRATULATIONS! YOU ARE A GUARANTEED AWARD RECIPIENT. CHECK IN THE NAME OF [XXXFIRST AND LAST NAMEXXX] NOW AVAILABLE . . . You have definitely won a cash prize. CONGRATULATIONS! $3,900,000.00 THREE MILLION NINE HUNDRED THOUSAND DOLLARS STANDS TO BE PAID AND YOU'RE HOLDING THE WIN OPPORTUNITY DOCUMENTS IN YOUR HANDS RIGHT NOW! Here's all you need to do to verify your claim. . . once you've verified your information, sign, date and send us the document with your one-time processing fee of $20 in the envelope herewith."

b.    During the recruitment process for Client 3, the KBM Finance Department conducted a due diligence review and found various red flags, including online consumer complaints about Client 3 being a scam. One KBM employee in the SOCO group stated, "they're coming up as scams in google (not surprising)" and also noted, "They are scams and likely don't have websites." These red flags were elevated to the Finance Department Controller who subsequently did not approve extending a line of credit to Client 3, thereby

B-6

inhibiting the licensing of data to Client 3. The General Manager of Merchant Services and a vice president persuaded the Finance Department Controller to approve Client 3. KBM began shipping consumer data to Client 3 shortly thereafter.

      c.     Despite the fraudulent nature of Client 3's solicitations and the red flags identified during the Finance Department due diligence process, KBM licensed the names of more than a hundred thousand U.S. consumers to Client 3.

13.     Throughout the Relevant Time Period, KBM lacked formal compliance policies that prohibited licensing data to clients with deceptive or fraudulent solicitations. At times, on a temporary and ad hoc basis, certain employees took it upon themselves to restrict data licensing to clients that had been the subject of law enforcement action. Nevertheless, KBM employees, including managers, knew about deceptive and fraudulent solicitations in the Solo-Continuity sector and resisted efforts to impose more stringent and consistent compliance and due diligence standards.

14.     During the Relevant Time Period, KBM sold data associated with millions of U.S. consumers to clients engaged in fraudulent mass-mailing schemes.

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, KBM Group LLC ("KBM" or "the Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, reasonable and appropriate reviews of internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns. To the extent reasonable, practicable, and appropriate, this compliance program will apply to all communications channels. The specific internal controls, compliance policies, and procedures implemented in KBM's lines of business may vary. However, at a minimum, the controls, policies, and procedures in each line of business should include, but may not be limited to, the following elements, to the extent that they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

The Company has required, and will ensure in the future, that its senior management provides strong, explicit, and visible support of and commitment to its corporate policy against fraudulent or deceptive marketing by its clients and to the Company's compliance code. The Company will also ensure that middle management, in turn, reinforces those standards and encourages employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations.

*Policies and Procedures*

KBM has developed or will develop and promulgate clearly articulated and visible corporate policies that prohibit it from providing data to clients engaged in fraudulent or deceptive marketing. The policy, or policies, shall be memorialized in a written compliance code related to fraudulent or deceptive marketing by clients.

KBM has developed or will develop and promulgate compliance policies and procedures designed to reduce the possibility of the Company transferring or selling consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, in violation of the Company's compliance code. KBM has taken or will take measures to encourage and to support the observance of ethics and compliance policies and procedures against the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns by personnel at all levels of the Company. These policies and procedures that are designed to detect and prevent the

transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns shall apply to all officers and employees. KBM shall notify all employees that compliance with these policies and procedures, which are designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, is the duty of individuals at all levels of the Company. The Company will also take appropriate measures to ensure that it does not accept contractual obligations with any client, or any other party, that interfere with the Company's ability to abide by its compliance code, policies, and procedures.

Consistent with its compliance code, policies, and procedures, the Company has instituted or will institute risk-based due diligence and compliance requirements aimed at detecting and deterring the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns. These efforts include or will include the elements of client due diligence and consumer solicitation review, at a minimum with regard to solicitations offered by mail and email, using a risk-based approach and in circumstances and at intervals in which such measures are reasonable, practicable, and appropriate:

*Client Due Diligence –*

The Company will perform risk-based due diligence on a client in situations where the Company is selling or transferring consumer data to the client, or to a third-party at the direction of that client, in circumstances and at intervals where such measures are reasonable, practicable, and appropriate. Such due diligence will include reasonable review, as necessary, of publicly available information sources, including the websites of federal enforcement authorities, that the Company determines may help to indicate whether a current or prospective client seeking consumer data for marketing purposes, or those associated with it, has been or is engaged in fraudulent or deceptive marketing to consumers.

*Consumer Solicitation Review –*

The Company also will conduct a risk-based review of consumer solicitations, or creative marketing pieces, associated with client requests to acquire the Company's consumer data for the purposes of sending a specific solicitation, in circumstances and at intervals where such measures are reasonable, practicable, and appropriate. Solicitation review, as appropriate, may be conducted through periodic audits, the sampling of solicitations or the review of example solicitations. To the extent practicable and reasonable, the Company has or will establish processes designed to verify that proposed consumer solicitations previously reviewed by the Company are in fact accurate representations of the solicitations actually disseminated by a client to which the Company has sold or transferred consumers' data, which may be conducted on a periodic and sample basis.

The Company's compliance program will be designed such that, during the Term of the Agreement, the Company will preserve all documents created and, to the extent

practicable, all documents reviewed, while maintaining and operating its client due diligence and solicitation review program. The document preservation will be designed to allow for reasonable auditing and assessment.  The Company will make such documents accessible, as reasonable and appropriate,  to Company legal and compliance personnel and auditors.

*Periodic Risk-Based Review*

The Company has developed or will develop these compliance policies and procedures on the basis of a periodic risk assessment of the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

KBM shall review its compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns in each line of business no less than annually and shall update them as is reasonable and appropriate to ensure their continued effectiveness.

*Proper Oversight and Independence*

The Company has assigned or will assign responsibility for the implementation and oversight of the Company's compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns to one or more senior corporate executives of the Company.  Such corporate official(s) shall have the authority to report directly to the Company's Chief Executive Officer, or any other appropriate executive, and shall have an adequate level of autonomy from management, as well as sufficient resources and authority to maintain such autonomy with respect to the implementation and oversight of the compliance policies and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

*Training and Guidance*

The Company has implemented or will implement mechanisms designed to ensure that its compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns are effectively communicated to all executives, officers, employees, and when necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training about compliance measures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns for all executives, officers, and employees in positions of leadership or trust, and those that hold positions that require such training, for example, among other potential groups of employees, sales employees, employees in the legal department, and those who perform compliance functions; and (b) corresponding certifications by all such executives, officers, employees, agents, and business partners that acknowledge the training requirements related to detecting and

deterring the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns and certify compliance with those requirements.

KBM will maintain, or where necessary and appropriate establish, an effective system for providing guidance and advice to executives, officers, and employees and, when necessary, agents and business partners, on abiding by the Company's compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including when any of them need advice on an urgent or expedited basis.

*Internal Reporting and Investigation*

KBM will maintain, or if necessary establish, an effective system for internal, and when possible, confidential reporting by, and protection of, executives, officers, employees, and when appropriate, agents and business partners, concerning the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns or violations of the Company's compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

KBM will maintain, or if necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting any allegations that the Company's clients are engaged in fraudulent or deceptive marketing or are otherwise violating the Company's compliance code, policies, or procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns

*Enforcement and Discipline*

KBM has implemented or will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including mechanisms that appropriately incentivize compliance and that discipline violations.

KBM has implemented or will implement appropriate disciplinary procedures to address, among other things, any employee's provision of data or services to clients engaged in fraudulent or deceptive marketing.  Such procedures shall be applied consistently and fairly, regardless of the position held by, or the perceived importance of, the subject executive, officer, or employee.  The Company has implemented or shall implement procedures to ensure that when misconduct is discovered, the Company undertakes reasonable and appropriate steps to remedy the harm that resulted from the misconduct and to ensure that reasonable and appropriate steps are taken to prevent similar misconduct from occurring in the future, including by assessing the Company's internal controls, its compliance code, policies, and procedures related to deceptive

marketing by clients, and by making any necessary modifications to ensure that the Company's overall compliance program is effective.

### Consumer Rights

The Company has instituted or will institute, to the extent required by and permissible under applicable law, a reasonable process by which an individual consumer may request a copy of his or her personal information held by the Company for the purpose of the transfer or sale of data to current or prospective clients. The Company also has instituted or will institute, to the extent required by and permissible under applicable law, a reasonable process by which an individual consumer may request that the Company not sell his or her personal information to current or prospective clients.

### Mergers and Acquisitions

KBM has developed and implemented, or will develop and implement, policies and procedures regarding mergers and acquisitions that require the Company to conduct risk-based due diligence on potential new business entities that includes diligence regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including appropriate due diligence by legal, accounting, and compliance personnel.

KBM has ensured or will ensure that its compliance code, policies, and procedures related to detecting and deterring the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns apply as quickly as is practicable to any newly acquired businesses or entities merged with the Company. KBM will promptly: (a) train the executives, officers, employees, and when appropriate, agents and business partners on its compliance code, policies, and procedures related to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns; and (b) when warranted, conduct a risk-based review of newly acquired or merged businesses as quickly as is practicable regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

### Monitoring and Testing

KBM will conduct periodic reviews and testing of its compliance code, policies, and procedures related to preventing and detecting the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns that are designed to evaluate and improve their effectiveness in preventing and detecting the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns and any related violations of the Company's code, policies, and procedures related to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns. The Company's reviews and tests shall take into account relevant developments in the industry and any evolving international, domestic, and industry standards related to the transfer or sale of

consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

KBM will maintain, or where necessary establish, effective processes and procedures that enable the Company, to the extent possible, to detect the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

ATTACHMENT D

**REPORTING REQUIREMENTS**

KBM Group LLC ("KBM") agrees that it will report to the United States

Department of Justice, Consumer Protection Branch and the United States Attorney's

Office for the District of Colorado (collectively, "the Government") periodically, at no

more than twelve month intervals during a thirty month term (the "Term"), regarding

remediation and implementation of the compliance program and internal controls,

policies, and procedures described in Attachment C of this Agreement.  During this

thirty month period, KBM shall: (1) conduct an initial review and submit an initial report,

and (2) conduct and prepare at least two follow-up reviews and reports, as described

below:

a.      By no later than sixty days from the date this Agreement is executed, KBM

shall submit to the Government a written initial report setting forth a complete

description of its remediation efforts to date, its proposals reasonably designed to

improve KBM's internal controls, policies, and procedures to ensure that it maintains an

effective compliance program, including a system of internal controls designed to

effectively detect and deter violations of federal law associated with the acquisition,

possession, transfer, use, and sale of consumer data, ("Federal Law") and the proposed

scope of subsequent reviews.  The report shall be transmitted to:

Director, Consumer Protection Branch
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington,  DC 20001

and

Chief, Criminal Division
U.S. Attorney's Office
District of Colorado
1801 California Street, Ste 1600
Denver, CO 80202

KBM may extend the time period for issuance of the report with prior written approval of the Government.

b.     KBM shall undertake at least two follow-up reviews and reports, incorporating the views of the Government on KBM's prior reviews and reports, to further monitor and assess whether KBM's policies and procedures are reasonably designed to detect and prevent violations of Federal Law.

c.     Each follow-up review and report shall be completed by no later than 365 days after the previous report is submitted to the Government.  The final follow-up review and report shall be completed and delivered to the Government no later than sixty days before the end of the Term.

d.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public,  except as otherwise agreed to by the parties in writing, or except to the

extent that the Government determines in its sole discretion that disclosure would be in furtherance of the Government's discharge of its duties and responsibilities or is otherwise required by law.

e.    KBM may extend the time period for submission of any of the follow-up reports with prior written approval of the Government.